**In re VIC SNYDER, INC., Debtor.**

**Bankruptcy No. 81–04301K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 28, 1985.

See also Bkrtcy., 23 B.R. 185, Bkrtcy., 23 B.R. 679.

James A. Hartz, Abington, Pa., for debtor.

Edwin P. Smith, Philadelphia, Pa., for Bruce C. Stern.

## OPINION

WILLIAM A. KING, Jr., Bankruptcy Judge.

The issue underlying this objection to claim dispute is whether the debtor is liable to a former employee for breach of contract damages by terminating the employee without genuine dissatisfaction with his performance. For the reasons stated herein, the Court finds that the debtor's dissatisfaction was genuine and there was no breach of contract. Therefore, we will sustain the debtor's objection and disallow that portion of the claim based on damages for breach of contract.

## FACTS [1]

Bruce C. Stern ("Stern") began working for Vic Snyder, Inc. ("debtor") as a plumber's helper in June of 1976. In July of 1976, Stern was brought into the offices of the debtor to assist Salvatore Contino ("Contino") with routine office duties. Stern and the debtor entered into a written employment contract on August 31, 1976. The contract called for Stern's employment as the debtor's general office manager for a period of two (2) years, with an option for a third year, exercisable by Stern. Paragraph four (4) of the contract provided for termination of Stern's employment should the members of the debtor's Board of Directors become dissatisfied with Stern's performance.[2] Sixty (60) days written notice was to be given in case of a breach by either party. At the time the agreement was executed, Contino and Victor M. Snyder ("Snyder") were the members of the Board of Directors.

On February 22, 1977, Stern was informed by Contino and Snyder that his employment with the debtor was terminated. At the time of termination, Stern had been employed as the debtor's office manager for seven (7) months. Stern filed a breach of contract action against the debtor in the Court of Common Pleas of Philadelphia County following his termination. On May 29, 1980, a jury returned a verdict in Stern's favor, and judgment was entered against the debtor in the amount of $65,-000.00 plus interest and twenty-five percent (25%) attorneys' fees. The debtor's post-trial motions to overturn the jury verdict were denied on September 29, 1981. Thereafter, the debtor filed an appeal to the Superior of Pennsylvania.

On October 20, 1981, the debtor filed a petition under Chapter 11 of the Bankruptcy Code ("Code"). Stern filed a proof of claim, based on the Common Pleas Court judgment, in the amount of $104,001.63.

On February 14, 1984, the Superior Court overturned the verdict and the judgment in its entirety, and remanded the case to Common Pleas Court for retrial. Stern's petition for reargument on the debtor's appeal was denied on April 30, 1984.

Retrial of Stern's breach of contract suit in the Court of Common Pleas is statutorily stayed by the automatic stay provisions of the Code, 11 U.S.C. § 362(a). Thus, in so far as Stern's claim in the debtor's bankruptcy case is based on the overturned Common Pleas Court judgment, it must be disallowed. Upon the Superior Court's reversal of that judgment, Stern's claim was reduced to unliquidated, contingent, and disputed status. Therefore, the parties have stipulated that Stern's proof of claim shall be treated as if it is based solely upon the August 31, 1976 employment contract between Stern and the debtor. The debtor has filed an objection to the claim, seeking estimation of the value of Stern's claim, if any, under section 502(c) of the Code.[3]

Prior to trial of the case in state court, the parties conducted discovery depositions. The parties have stipulated that these depositions and the trial testimony

---

**1.** This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Bankruptcy Rules.

**2.** Paragraph 4 states as follows:

"Stern shall at all times discharge his duties in consultation with and under the supervision of the Board of Directors of the CORPORATION through Salvatore Contino, and STERN shall be solely responsible for the quality of his services to the said Board of Directors and the said Salvatore Contino. The employment of STERN shall continue only so long as the services rendered by him are satisfactory to the Board of Directors and Salvatore Contino, regardless of any other provisions contained in this Agree-

ment. The Board of Directors and Salvatore Contino shall be the sole judges as to whether the services of STERN are satisfactory."

**3.** Section 502(c) provides:

There shall be estimated for purposes of allowance under this section—

(1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the closing of the case

. . .

When a disputed claim is based on an alleged breach of contract, § 502(c) requires that the Court estimate its worth under applicable contract law. *See Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134 (3d Cir.1982).

may be used in this objection to proof of claim matter.

The parties have also stipulated that should this Court find that the debtor breached the employment contract, Stern's claim should be allowed in the amount of $65,172.18, plus attorneys' fees and pre-petition interest. If no breach is found, the Court should sustain the debtor's objection and allow Stern's claim in the amount of $3,678.00, plus attorneys' fees and pre-petition interest.

The Superior Court, in reversing the trial court judgment, found that the trial court had erred in instructing the jury regarding the "satisfaction" clause in the contract. The Court identified the proper substantive law standard to be applied to the case on remand by citing the holding of the Supreme Court of Pennsylvania in *Jenkins Towel Service v. Tidewater Oil Co.*, 422 Pa. 601, 223 A.2d 84 (1966). In that case, the Supreme Court stated:

> (Satisfaction) contracts are not strangers to the law of Pennsylvania and have been considered by us on numerous previous occasions. We have consistently held that where a contract provides for performance by one party to the satisfaction of the other, "the test of adequate performance is not whether the person for whom the service was rendered ought to be satisfied, but whether he is satisfied, there being, however, this limitation, that any dissatisfaction on his part must be genuine and not prompted by caprice or bad faith." (Emphasis in original.) *Kramer v. Phila. Leather Goods Corp.*, 364 Pa. 531, 73 A.2d 385 (1950); *Burke v. Daughters of Holy Redeemer*, 344 Pa. 579, 26 A.2d 460 (1942); *Singerly v. Thayer*, 108 Pa. 291, 2 A. 230 (1885).

422 Pa. at 606, 223 A.2d at 86. *See also Aster v. B.P. Oil Corp.*, 412 F.Supp. 179 (M.D.Pa.1976); *Feinberg v. Automobile Banking Corporation*, 353 F.Supp. 508 (E.D.Pa.1973); *Marine Transport Lines, Inc. v. Publicker International, Inc.*, 303 F.Supp. 423 (E.D.Pa.1969); *Commonwealth v. Department of Prop. & Sup. v. Berger*, 11 Pa.Cmwlth. 332, 312 A.2d 100 (1973).

The parties have stipulated that the above caselaw should be applied by this Court in determining the value of Stern's claim.

## DISCUSSION

■ Our jurisdiction over the instant core proceeding[4] is derived from § 1334 of title 28 of the United States Code, as implemented by the referral Order of July 25, 1984 of the United States District Court for the Eastern District of Pennsylvania, pursuant to § 157 of title 28. 28 U.S.C. § 1334; 28 U.S.C. § 157. The evidentiary effect to be afforded a proof of claim is specified in Bankruptcy Rule 3001(f) which states that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." At a hearing on an objection to a proof of claim, the burden of going forward with evidence is on the debtor. *In re Eastern Fire Protection, Inc.*, 44 B.R. 140, 142 (Bkrtcy.E.D.Pa. 1984).

In the instant objection to claim matter, the debtor sought to prove that Stern was dismissed because Contino and Snyder were not satisfied with Stern's performance of his job responsibilities. Although there was some dispute as to the scope of Stern's responsibilities, it is clear that his responsibilities included the monitoring of labor and material costs, and the supervising of salesmen and mechanics. Specifically, the debtor contends that labor and material costs increased during Stern's tenure as office manager, adversely affecting the profitability of the business, and that Stern was unable to master the supervisory functions of his job.

---

**4.** Core proceedings include allowance or disallowance of claims against the estate and estimation of claims for the purpose of confirming a plan under Chapter 11. 28 U.S.C. § 157(b)(2)(B). The Advisory Committee Note to Bankruptcy Rule 9014 provides that the filing of an objection to a proof of claim creates a dispute which is a contested matter.

The debtor points to a series of events from November of 1976 to February of 1977 which establish a "pattern of *communicated* dissatisfaction with Stern's job performance." (emphasis added.)

First, there was a meeting in the corporate offices in November of 1976. Contino, Snyder, Stern, and Joseph P. Piatowski, the controller of the corporation, were present. Snyder, Contino and Piatowski testified that the discussion at that meeting centered on reduced corporate profits for the three (3) month period from August to October of 1976; increased labor and material costs during that time; and an assessment that the increased costs were primarily Stern's responsibility.[5] All three (3) of the debtor's witnesses stated that Stern was informed of the need to improve the corporation's financial situation at that meeting. Stern testified that although corporate profits were discussed, his job performance was not addressed at the meeting.

The second event took place in January of 1977 while Contino was on vacation and Snyder was in the office on semester break during his first year of law school. Snyder testified that it became manifestly apparent to him at that time that Stern just didn't know what he was doing.

"Q Specifically, what happened that you recall during that period of time.

A Stern couldn't coordinate the mechanics. He was sending mechanics to jobs, he was sending too many mechanics to a given job. One job that comes to mind, for instance, two houses that were side by side. He sent two mechanics, two loads of heavy equipment, he took out two permits when only one was necessary to do the job. I remember it was in South Philadelphia on Emory Street.

Q What was wrong with that?

A Its just profligate. Its just a waste of money.

Q Were you in the office when Stern did that?

A Yes."

N.T. p. 7.

Snyder testified that he sent Stern home and told him to take a "vacation" after the Emory Street incident. Stern claims he was not aware of Snyder's dissatisfaction with his performance at that time, and that he asked to take a vacation so that he could make settlement on a new house. Stern had not taken any time off from his job since assuming the office manager position in September of 1976.

Snyder operated the debtor's business while Contino and Stern were absent in January of 1977. Snyder later told Contino about the Emory Street incident when Contino returned. Snyder stated that he told Contino that Stern "just wouldn't put the Vic Snyder hat on." N.T. p. 9.

After several conversations and discussions, Contino and Snyder mutually decided that Stern's employment was no longer in the best interests of the company and that he should be discharged.

Stern was informed of his termination by Contino at a meeting on February 22, 1977, which Snyder joined while it was in progress. Snyder and Stern testified that at that meeting, the two (2) reasons given to Stern for his termination were the downturn in overall corporate profits and his inability to master the supervisory requirements of his job.

Turning now to Stern's arguments in support of his claim, Stern sought to prove at the hearing that Contino and Snyder acted capriciously and out of whim in discharging him, and that they were not, in fact, dissatisfied with his performance of the job for which he was hired.

Stern claims he was unaware of any dissatisfaction on the part of either Contino or

---

**5.** There was some discrepancy in the controller's testimony as to whether sales also decreased during the three (3) month period in question. Although he testified on direct examination that sales were up, he was reminded on cross-examination of his 1979 deposition testimony that sales decreased by $50,000.00—$60,000.00 during the period in question.

Snyder prior to being discharged. However, Stern admits that he overheard a conversation between them in early February of 1977 where Snyder complained of Contino's methods of training Stern. Snyder insisted that Contino do it Snyder's way.

Stern claims that the reasons given by Contino and Snyder for his dismissal, i.e., the downturn in the profitability of the business and Stern's inability to manage, were merely devised by them as "pretexts" for his dismissal. Stern's hiring coincided with Snyder's enrollment in law school in the fall of 1976. Stern posits that the real reason he was dismissed was that Snyder found he had more time available to run the business than he thought he would when he enrolled in law school, and, therefore, Stern's services were no longer necessary.

Lastly, Stern claims his duties as general office manager did not include running the entire business, although Snyder expected him to be able to do so. Once a salesman entered into a contract with a customer, Stern's duties, according to his testimony, were to assign equipment and plumbers to the job, to confirm the appearance of the plumbers on the job, and to confirm payment upon completion of the job. Stern claims that if Contino and Snyder were dissatisfied with his performance, it was with his performance as manager of the business and not with his performance of the job he was hired to do.

■ Upon consideration of the testimony presented at the hearing by both the debtor and Stern, we find that the debtor's version of why Stern was terminated is more plausible. In general, it appears that Stern was not qualified to perform the type of managerial and supervisory functions he was assigned, and that the debtor could not afford to risk letting Stern continue in a management capacity for whatever length of time it took him to acquire managerial skills.

There were some inconsistencies in the testimony of the accountant for the debtor as to the financial picture of the debtor during the time when Stern was employed as office manager. Therefore, we are not convinced that the purported decline in corporate profits was clearly attributable to Stern's performance. Stern's decisions during the first few months on the job may have contributed to the decline in profits, but the time frame is too circumscribed and there are too many variables for this Court to base its decision as to the genuineness of the debtor's dissatisfaction with Stern solely on the testimony regarding a decline in corporate profits.

What was more convincing in this matter was the testimony regarding dissatisfaction with Stern's ability to supervise and manage.

Snyder was asked at the hearing whether he was satisfied with the effort Stern was putting into the job. He replied that he was satisfied with the effort but not the results. His testimony was as follows:

Q What happened after the November meeting and the situation you just described when you asked Mr. Stern to take a vacation? Did Mr. Stern's duty performance improve, job performance improve?

A Not discernibly, but I did ask him to attend a night school, Dobbin's Vocational School. I did that at the meeting, I believe; if I didn't do it at the meeting I did it before or shortly after the meeting. I asked him to spend more time on the street so that he could be more empathetic to the play of the mechanic out there and gain their respect. I knew when he applied for the job that he had a short period of time to learn. I told him that in no uncertain terms even before we entered into a contract. He said he was dissatisfied with teaching, he didn't want to be a baby-sitter any longer, and I said, you're not going to be dealing with babies out there. I encouraged him to go out on the street to see what was happening, and he didn't do that. I encouraged him to go to night school, he didn't do that. I encouraged him

to go out with the estimators, he didn't do that.

N.T. pp. 6–7.

It is clear that Stern needed an overall understanding of the business in order to perform his duties properly and that he did not acquire that understanding to the satisfaction of Snyder and Contino. According to the caselaw cited in the Superior Court decision, an employer may dismiss an employee, and not be found in breach of contract, as long as the dissatisfaction with the employee's performance was genuine and not motivated by bad faith. The Court need not inquire into the reasonableness of the dissatisfaction.

We find that the debtor's dissatisfaction with Stern's performance in this matter was genuine and that there was no breach of contract. We will enter an Order sustaining the debtor's objection to that portion of Stern's claim based on damages for breach of the employment contract and allow the balance of Stern's claim in the amount of $3,678.00, plus twenty-five percent (25%) attorneys' fees and pre-petition interest.